# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**ROBERT HURLEY and**
**GAIL HURLEY,**                                    Chapter 7
    Debtors                              Case No. 13-12511-JNF


~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**TAMMY HORTON,**
    Plaintiff
v.                                                  Adv. P. No. 13-1312
**ROBERT HURLEY d/b/a**
**CARVER AUTO SALES,**
    Defendant


~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion for Summary Judgment filed by the

Defendant, Robert Hurley, d/b/a/ Carver Auto Sales ("Hurley") with respect to Counts

I and II of the Complaint.  The Plaintiff, Tammy Horton (the "Plaintiff" or "Horton") filed

a Memorandum in Opposition to the Motion for Summary Judgment.   Both Hurley and

Horton filed affidavits.  The Court heard the Motion on April 2, 2014 and took the matter

under advisement.

## II. BACKGROUND

Hurley and  his spouse (jointly, the "Debtors") filed a voluntary Chapter 7 petition

on April 30, 2013, together with their Schedules, Statement of Financial Affairs and other required documents.[1]  On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtors listed Horton with a claim in the amount of $20,000.  In their amended Statement of Financial Affairs, the Debtors disclosed the existence of a sole proprietorship, Carver Auto Sales, a used automobile business, through which Hurley conducted operations between 1988 and 2012 from a location at 36 North Main Street, Carver, Massachusetts.

On June 2, 2013, the Chapter 7 Trustee filed a Report of No Distribution.  On July 30, 2013, the Court granted the Debtors a discharge of all dischargeable debts.

On June 22, 2013, Horton timely filed a seven-count Complaint against Hurley seeking an exception to discharge and against HarborOne Credit Union ("HarborOne") seeking other relief.  The Plaintiff's counts are as follows:  Count I-11 U.S.C. § 523(a)(6); Count II-11 U.S.C. § 523(a)(2); Count III-15 U.S.C. § 2301 et seq.,[2]  Count IV-Mass. Gen. Laws ch. 106, Article 2 [sic];[3]  Count V-Mass. Gen. Laws ch. 93A; Count VI-Fraud/Intentional Misrepresentation; and Count VII-Claims against HarborOne Credit Union, ("HarborOne"), through which she asserted that it was liable for any claims against

---

[1] The Debtors disclosed that they previously had filed a Chapter 13 petition on February 13, 2013.  That case was dismissed two months after it was filed as the Debtors did not contest the Chapter 13 Trustee's Motion to Dismiss.

[2] The statute is known as the Magnuson-Moss Warranty - Federal Trade Commission Improvement Act.  The statute, *inter alia,* addresses minimum disclosure standards for written consumer product warranties.

[3] The Plaintiff invokes the implied warranty of merchantability.

the Debtor pursuant to 16 C.F.R., Part 433.  HarborOne moved to dismiss the Complaint

with respect to Horton's claims against it.  The Court granted HarborOne's Motion on

November 6, 2013.

## III. THE MOTION FOR SUMMARY JUDGMENT

On January 27, 2014, Hurley moved for summary judgment on Counts I and II of

Horton's Complaint.  He included a Statement of Undisputed Facts in his Memorandum

and an affidavit.  Horton also filed a Statement of Undisputed Facts and an affidavit.

Hurley, beginning in 1991 until January of 2013 owned and operated a used motor

vehicle dealership under the name "Carver Auto Sales."   On June 21, 2012, Horton

purchased a 2006 Chevy Trailblazer (the "Trailblazer"), with 38,802 miles, from Hurley for

a purchase price of $15,500.  According to Horton, she relied upon Hurley's reputation and

experience to sell her a vehicle which would meet her needs for daily personal

transportation, and that Hurley assured her that the 6-year old Trailblazer would meet

those needs.  The purchase agreement provided for a price of $15,500, a trade in allowance

of $1,500 for a "total contract price" of $14,000.  Because of a balance due on a trade in of

$2,000, the amount to be financed was set forth at $16,000 with a total payment of $15,500.

Prior to executing the purchase agreement, Horton observed that the Trailblazer's

check engine light was on.  Hurley agreed to have the cause for this warning light

identified and corrected.  Hurley, prior to the Horton's purchase, delivered the vehicle to

Topham Automotive, Inc. ("Topham Automotive") located in Middleborough,

Massachusetts. The repair order submitted by Hurley, dated June 20, 2012, establishes that

3

the mechanic at Topham Automotive, Inc. "scanned and found a evap code[,] did a pin point test and found the fuel tank pressure switch had to [sic] much voltage[,] replaced and cleared code." In addition, the mechanic replaced two fog light bulbs and the license plate light, replaced the rear wiper arm and repaired the center console. Hurley paid the invoice for repairs which totaled $486.01.

On June 21, 2012, Horton completed the purchase. In his affidavit, Hurley stated that [a]t no time before the purchase of the Vehicle was I aware of any mechanical defects of any kind."

In connection with the purchase of the Trailblazer, Horton executed a Retail Installment Sale and Security Agreement with HarborOne. That contract provided for a total amount financed of $17,945 with a total of payments of $21,959.28. It set forth the cash price of $16,000 and contained the following notice in bold font:

> NOTICE TO THE BUYER: **1. Do not sign this contract if any of the spaces intended for the agreed terms to the extent of the then available information are left blank . . .**

A Limited Use Vehicle Warranty (the "Warranty") was included with the sale of the Trailblazer and was set forth on a document captioned "Federal Buyer's Guide." The terms of the Warranty provided that it would be for 90 days, or 3,750 miles for "Systems Covered,"[4] and Hurley would be responsible for 100% of the parts and labor, subject to a $100 deductible. The Warranty, referencing "the Massachusetts Used Car Warranty Law,

---

[4] Those systems were the engine system, the automatic or standard transmission/transfer case system, the drive axle system (front and rear), the brake system, the electrical system, the steering system and the radiator.

4

General Laws Chapter 90, Section 7N1/4,[5] provided in relevant part:

_____

[5] Section 7N1/4 provides in pertinent part the following:
(3) (A) A dealer may repair, within the meaning of this section, either by performing the repair himself or by arranging and making payment for prompt repair by another.

(i) A consumer shall return a vehicle for repair under this section by presenting it to the dealer no later than five business days after the expiration of the applicable warranty period and informing him of the defect. Said return period shall be tolled during any time period in which the consumer has notified the dealer of the defect but cannot reasonably present the vehicle to the dealer; including, but not limited to, the reason that a used motor vehicle is inoperable and the dealer refuses to pay the charge to tow said vehicle. The dealer shall immediately accept return of a vehicle when it is so presented. Said used motor vehicle shall be deemed out of service commencing the day it is so presented, notwithstanding any dealer's failure to accept its return on said day. During the applicable warranty period and the aforesaid return period, the dealer shall pay the reasonable costs of towing from point of breakdown up to thirty miles to obtain required repairs or to return the vehicle to the dealer.

Upon return of the used motor vehicle to the consumer after repair, the dealer shall provide the consumer with a warranty repair receipt describing (a) the defect complained of, (b) the work performed in an attempt to correct such defect and the identity of the repairer if it is not the dealer, and (c) the parts replaced in performing such work. For the dealer to toll the ten business day period as provided in clause (ii) of this paragraph said dealer shall attach to each such warranty repair receipt copies of such order forms, invoices, receipts or other evidence of a parts order and its receipt to evidence his compliance with this paragraph.

(ii) If the dealer fails to repair the same defect within three attempts, or if the used motor vehicle is out of service for more than a cumulative total of ten business days after the consumer has returned it to the dealer for repair of the same, then the dealer shall accept return of the vehicle from the consumer and *refund the full repurchase price*, less a reasonable allowance for use. A reasonable allowance for use shall be fifteen cents for each mile the used motor vehicle has been operated between its sale and the dealer's repurchase.

UNDER THE LAW YOU HAVE A RIGHT TO REFUND IF:

(a) a defect that impairs safety or use arose during the warranty period, AND

(b) the defect continued to exist or has recurred during the warranty period after either:

1. three or more repair attempts for the same defect, or

2. being out of service after being returned for repair for any defect for a cumulative total of 10 or more business days.

IF THE DEALER DOES NOT ISSUE A REFUND, YOU HAVE A RIGHT TO HAVE YOUR CASE ARBITRATED BY THE STATE IF YOU APPLY WITHIN SIX MONTHS AFTER DELIVERY OF THE VEHICLE.

---

A consumer shall have the option of retaining the use of any vehicle returned under the provisions of this section until such time as said consumer has been tendered a full refund. The use of any vehicle retained by a consumer after its return to a manufacturer under the provisions of this section, shall, in instances in which a refund is tendered, be reflected in the above-mentioned reasonable allowance for use.

A used motor vehicle shall not be considered out of service for purposes of the ten business-day period described hereinabove for any day in which a part necessary to repair a defect complained of is not in the dealer's possession; provided, however, that the dealer has ordered the part by reasonable means on the same day on which he knew or should have known that the part was necessary, except that in no event shall a part's unavailability operate to toll the ten business-day period for more than twenty-one days. The applicable warranty period shall be extended by the number of days a part is unavailable.

(6) A dealer's failure to comply with any of the provisions of this section shall constitute an unfair or deceptive act under the provisions of chapter ninety-three A.

Mass. Gen. Laws ch. 90, § 7N1/4(3), (6) (emphasis supplied).

The Warranty also provided that it would be "extended one day for every day the vehicle is in the shop for repairs, and one mile for every mile the vehicle is driven between the dealer's acceptance of the vehicle for repair and its return to the consumer," and "30 days from the completion of any repair attempt for every defect that was the subject of the repair attempt." The Warranty also provided that "[t]he dealer will give you a refund if a defect that impairs the safety or use of the vehicle continued to exist or recurred within the Warranty after either three repair attempts for the same defect or being out of service after being returned for repair of any defect or defects for a cumulative total of ten or more business days." Both the Debtor and Horton signed the Warranty, which would expire on September 19, 2012 or when the mileage reached 42,552, in the absence of extension for repairs and interruption of use.

On July 27, 2012, Horton informed Hurley that the check engine light was on again and that she was experiencing problems with the vehicle's transmission. According to Horton, Hurley told her to take the Trailblazer to Topham Automotive for repairs, which she did. On July 31, 2012, the Trailblazer vehicle was returned to Horton, with the claim that the problem had been fixed. An invoice from Topham Automotive, written on July 30, 3012 by Shawn Brant, establishes that four jobs were performed, including 1) checking the rear entertainment unit and replacing a broken wire under the dash; 2) checking for power to the air conditioning compressor and replacing the air conditioning relay; 3) servicing the air conditioning unit ("EVAC and recharge A/C, test for leaks"); and 4) checking the engine light, scanning and finding a code for the secondary air pump, finding

7

a cracked hose, and replacing the hose and clearing the code. The cost of the repairs totaled $434.27.  Hurley paid the invoice in full.

Immediately after taking possession of the Trailblazer, however, Horton again noticed that the check engine light was on.  On August 1, 2012, Horton contacted Topham Automotive.  Horton took the Trailblazer back to Topham Automotive at Hurley's direction.  Topham Automotive ran a diagnostic test to determine the cause of the check engine light being on and discovered that there was a General Motors ("GM") recall bulletin, which meant that the problem could only be corrected at an authorized GM dealership.

On August 8, 2012, Horton took the Trailblazer to Tracy Chevrolet in Plymouth, Massachusetts where she was told that there were no outstanding recalls on the Trailblazer. On August 14, 2012, Horton had the dealership perform diagnostic tests on the Trailblazer to identify possible defects causing the check engine light problem.  Mechanics and Tracy Chevrolet evaluated the problem and determined that there was a malfunction in the secondary air valve circuitry which needed to be replaced.  The dealership estimated the cost of the repair to be $375.  The mechanics at Tracy Chevrolet also completed a multipoint inspection and determined that there was a dirty engine air filter and a worn rear wiper blade.  It charged Horton $132, which Hurley paid.

On August 17, 2012, Horton returned the vehicle to Topham Automotive at Hurley's direction. On August 18, 2012, Topham Automotive prepared an invoice in the amount of $292.80, less $100 paid by Horton for the deductible, for a net charge of $192.80.  The

mechanic at Topham Automotive replaced the secondary air injection and checked the valve.  Horton was told the vehicle was repaired.  Hurley paid the invoice, less the deductible.

According to Horton, before she even left the parking lot at Topham Automotive, the check engine light came on.  Horton immediately informed Hurley that the defect had not been repaired. On August 26, 2012, Horton again brought the Trailblazer to Topham Automotive, informing the mechanic that the engine light was on and that the transmission was not working properly.  On August 31, 2012, the mechanic at Topham Automotive informed Horton that the vehicle had been fixed, but after picking up the Trailblazer at 7:30 pm, the engine light came on immediately.  Horton told Hurley about the defect.

On August 1, 2012, the Trailblazer's mileage was 41,850 as reported by Topham Automotive.[6]   Seven weeks later, on September 18, 2012, before the expiration of the Warranty and at the time when the mileage was in excess of 43,300, Horton advised Hurley, by certified mail, return receipt requested, that she wished to exercise her right to a refund under the Warranty.  On or about September 25, 2012, Hurley responded in writing. In his letter, Hurley noted that Horton took the Trailblazer to a Massachusetts Inspection Station for inspection and obtained an inspection sticker, although he did not contest Horton's issues with the check engine light.  He indicated that the problem was

---

[6] According to Horton, she made at  least five repair attempts to get the Trailblazer repaired and Hurley refused to take the Trailblazer have the repairs performed, instructing her to take the vehicle to Topham Automotive.

misdiagnosed by Tracy Chevrolet, not Topham Automotive.

According to Horton, Hurley boasted that, based on his 21 years of experience and sales of over 5,000 vehicles, Horton's request for a refund was "unrealistic." She added that Hurley claimed that the Warranty had expired and refused to pay the refund.

In his letter, Hurley disputed Horton's version of events, stating in part the following:

> So if again because of a CHECK ENGINE LIGHT you want $20K dollars back or we go to court. PLEASE!  If that's the way you feel then that's what will have to happen or like i [sic] said you can call me and if you still have a pre-existing problem *even though you are out of warranty i* [sic] *would be more than happy to take care of it for you for no charge*. What more can a dealer do. [sic] This is why i [sic] have only been to court 4 out of over 5,000 customers.  I'm willing to work with my customers so the rest of your decision is on you. Please be very clear on what you are talking about here.  Your problems were not the same thing 3 or more times and i [sic] never declined to take care of anything during the warranty period and i [sic] am still opened [sic] to discuss and take care of any repairs that may be a result of misdiagnosis by Tracy Chevrolet even though your vehicle warranty I'm sure is over the 3750 miles driven by Mass. State Law from 6/21/12.

(emphasis supplied).

In her affidavit, Horton stated that Hurley made misrepresentations t in filling out the Retail Installment Sale and Security Agreement.  Hurley, however, did not execute that document and amount financed in the purchase agreement was the same as that on the Retail Installment Sale and Security Agreement, which, as noted above, contained an explicit warning about executing the document if information was omitted.  In addition, Horton, in response to interrogatories, stated that she had spent a total of $59.19 for repairs to and maintenance of the Trailblazer since September 1, 2012; of that amount $30.19 was

for an oil change.  Moreover, she indicated that the Trailblazer had 47,978 miles in January

of 2014 and was inspected on August 3, 2013.  Although she indicated that the Trailblazer

had failed the emissions test,[7] she admitted that she obtained an inspection sticker on that

date.

## IV. POSITIONS OF THE PARTIES

    A. <u>Hurley</u>

Hurley seeks summary judgment on Count I of the Complaint as he maintains that

the Plaintiff cannot meet her burden of proof under 11 U.S.C. § 523(a)(6) under the

standard articulated by the court, <u>Printy v. Dean Witter Reynolds, Inc.</u>, 110 F.3d 853 (1st

Cir. 1997).  He states that he paid for costs of repairs, even with respect to items not covered

under the Warranty, adding that Horton failed to identify anything that would suggest that

he knowingly and intentionally sold her a defective automobile.

With respect to Count, II, Hurley, citing <u>McCrory v. Spigel (In re Spigel)</u>, 260 F.23d

27 (1st Cir. 2001), and <u>Palmacci v. Umpierrez</u>, 121 F.3d 781 (1st Cir. 1997),  maintains that

the Plaintiff did not "even remotely" produce evidence to suggest that he knowingly made

misrepresentations or a false statement to her, let alone that he intended to deceive her, or

that she suffered any damage as a result. He observes:

> The Plaintiff alleges that the Defendant assured her the vehicle would
> "satisfy her needs", those needs being a reliable car to get to to work.  The
> Plaintiff continues to use the vehicle to commute to and from her job.  The

---

[7] Horton also submitted copies of the Debtors' Chapter 13 petition which was
filed on or around February 13, 2013.  As Horton did not bring claims under 11 U.S.C. §
727, the Court concludes the documents are not relevant to her present claims.

Plaintiff has driven the vehicle over 9,000 miles since it was purchased, and has identified only $59.19 in costs for repairs and maintenance since September, 2012.

B. The Plaintiff

The Plaintiff maintains that the willful and malicious injury was Hurley's refusal to issue a refund. She points to discrepancies between a prior Chapter 13 case filed by the Debtors on February 13, 2013 to support the element of malice. She adds:

> The Defendant also demonstrated malice by failing to take on the responsibility of performing the repairs himself, or at least arranging [sic] the repairs, but instead had Ms. Horton, an unsophisticated consumer, arrange the repairs herself. The facts also demonstrate that Ms. Horton requested repairs for a problem indicated by the engine light on at least 5 occasions within the warranty period. A trier of fact could find that Defendant had no just cause or excuse to refuse the refund under those facts.

With respect to Count II, the Plaintiff stated:

> A trier of fact can find multiple material misrepresentations in this matter. First, the Defendant represented the vehicle was reliable for daily transportation. This statement was false because the vehicle required multiple repairs related to the engine and failed inspection. And, at the time of the sale, the vehicle's engine light was on and the Defendant knew it was on as he promised to have it fixed prior to delivery. Second, the Defendant assured Ms. Horton the defect causing the engine light to turn on would be fixed before the vehicle would be delivered to complete the purchase. This statement was false because Ms. Horton returned the vehicle for repairs at least 3 times in order to fix a defect indicated by the engine light (the vehicle was also with the repair shop for more than 10 business days) and the Defendant offers no evidence of any work actually being performed to fix the defect prior to delivery. Third, the Defendant stated to Ms. Horton that the vehicle warranty had expired and that she was not entitled to a refund under the warranty. The Defendant either knew or should have known that Ms. Horton's refund request was made less than 90 days from the date of purchase and less than 30 days from the date of the last repair attempt. The Defendant also filled out the warranty stating it would be for 90 days and stating Ms. Horton's rights to a full refund. The vehicle was also under the

12

mileage limit at the time of the demand. The Defendant also acknowledges that the vehicle was brought in over the engine light issue. As a result, the Defendant either knew his statements regarding the warranty and Ms. Horton's rights were false or he had reckless disregard for its truth.

Horton also maintains that intent to deceive can be inferred from the foregoing representations, particularly those intended to induce her to purchase the vehicle and to induce reliance. She also contends that her reliance was justifiable because of Hurley's reputation and her status an unsophisticated consumer. Moreover, she contends that she suffered damages in the sum of $21,959.28, the amount financed. She argues that by failing to honor the Warranty, she lost the complete value of the refund, which would include the purchase price as well as any consequential or incidental damages. She adds her damages are defined by Massachusetts law, i.e., Mass. Gen. Laws ch. 90, § 7N1/4(3)(A)(ii).

## V. SUMMARY JUDGMENT STANDARD

The Plaintiff is entitled to summary judgment if she established that there are no material facts in dispute and she is entitled to judgment as a matter of law. *See* Fed. R. Civ.P. 56(a), made applicable to this proceeding by Fed. R. Bankr. P. 7056.[8] In Desmond v. Varrasso (In re Varrasso), 37 F.3d 760 (1st Cir.1994), the United States Court of Appeals for the First Circuit articulated the standard for allowance of motions for summary judgment, stating:

---

[8] Fed. R. Civ. P. 56 was amended effective December 1, 2010. The summary judgment standard now appears in subsection (a) of Rule 56, rather than at subsection (c). The amended rule, however, does not change the standard for summary judgment. *See* Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 n.4 (1st Cir.2011).

13

It is apodictic that summary judgment should be bestowed only when no
genuine issue of material fact exists and the movant has successfully
demonstrated an entitlement to judgment as a matter of law. . . . As to issues
on which the movant, at trial, would be obliged to carry the burden of proof,
he initially must proffer materials of evidentiary or quasi-evidentiary
quality—say, affidavits or depositions—that support his position. This
means, of course, that summary judgment is inappropriate if inferences are
necessary for the judgment and those inferences are not mandated by the
record.

37 F.3d at 763 (footnote omitted, citations omitted)

## VI. DISCUSSION

The  United States Court of Appeals for the First Circuit has observed: "Exceptions

to discharge are narrowly construed in furtherance of the Bankruptcy Code's 'fresh start'

policy, and, for that reason, the claimant must show that his claim comes squarely within

an exception enumerated in Bankruptcy Code § 523(a)." Palmacci v. Umpierrez, 121 F.3d

781, 786 (1st Cir. 1997).

A. Count I

Section 523(a)(6) of the Bankruptcy Code provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this
title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another
entity or to the property of another entity.

In Kawaauhau v. Geiger, 523 U.S. 57 (1998), the Supreme Court considered the claims of

judgment creditors who urged the Court that the malpractice award they obtained against

the debtor, Geiger, should be excepted from discharge under § 523(a)(6) "because Dr.

Geiger intentionally rendered inadequate medical care to Margaret Kawaauhau that

14

necessarily led to her injury." 523 U.S. 61. They maintained that Geiger "deliberately chose less effective treatment because he wanted to cut costs, all the while knowing that he was providing substandard care." Id. The Supreme Court, addressed the "pivotal question" of "[d]oes § 523(a)(6)'s compass cover acts, done intentionally, that cause injury (as the Kawaauhaus urge), or only acts done with the actual intent to cause injury (as the Eighth Circuit ruled)?" Id. It held:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes *a deliberate or intentional injury*, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964) (emphasis added).

Id. at 61-62 (emphasis supplied).

In Printy v. Dean Witter Reynolds, Inc. (In re Printy), 260 F.3d at 859, the First Circuit defined the term "malicious," as follows: "An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will."

In Bauer v. Colakathis (In re Colakathis), 417 B.R. this Court, citing McAlister v. Slosberg, (In re Slosberg), 225 B.R. 9, 21 (Bankr. D. Me. 1998), stated:

> Construing Geiger and Printy, together this Court concludes that, for an exception to discharge under 11 U.S.C. § 523(a)(6) to apply, the creditor has

15

the burden of showing ... that 1) the creditor suffered injury; 2) the debtor intended to cause the injury or that there was substantial certainty that the injury would occur; and 3) the debtor had no justification or excuse for the action resulting in injury. This is consistent with the Slosberg court's view that although "the terms [willful and malicious] might share elements, i.e., they both require that the act itself be intentional, they must have independent significance. In re Geiger should not be read to collapse the two elements into one." Slosberg, 225 B.R. at 19–20 (citations omitted).

Colokathis, 417 B.R. at 157–58. *See also* Hermosilla v. Hermosilla (In re Hermosilla), 430 B.R.

13, 22 (Bankr. D. Mass. 2010).[9]

---

[9] In Zhao v. Lauzon (In re Lauzon), No. 10-10641-JNF, 2012 WL 1192800 (Bankr. D. Mass. April 9, 2012), this Court observed:

Despite the interpretation of malice in the First Circuit and elsewhere, the law remains unsettled. For example, in GMAC, Inc. v. Coley (In re Coley), 433 B.R. 476 (Bankr. E.D. Pa. 2010), the court stated:

Courts also have invoked different standards for determining whether an intentional tort involved "malice" within the meaning of § 523(a)(6). For example in In re Long, 774 F.2d 875, 881 (8th Cir.1985), the court reasoned that, for the debt for any injury arising from an intentional tort to be nondischargeable under § 523(a)(6), the debtor's conduct must be "more culpable than that which is in reckless disregard of creditors' economic interests and expectancies." Further, in assessing the debtor's culpability, "knowledge that legal rights are being violated is insufficient to establish malice, absent some additional 'aggravated circumstances'. . ." Id. Other courts, too, have stated that the existence of "aggravating circumstances" and a conscious disregard of one's societal duties to others are essential aspects of the malice requirement under § 523(a)(6). *See, e.g.,* In re Logue, 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003); In re Richardson, 2007 WL 2381990, at *6–7 (Bankr. N.D. Ala. Aug.17, 2007); In re Wieser, 2007 WL 4868319, at *2 (Bankr. D. N.D. 2007); In re Hambley, 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005); In re Blankfort, 217 B.R. 138, 143–45 (Bankr. S.D.N.Y. 1998).

The Court finds that the undisputed facts permit but one conclusion:  there is no evidence that Hurley intended to injure Horton within the meaning of § 523(a)(6) as interpreted by the Supreme Court.  Indeed, the Plaintiff failed to submit evidence of a genuine issue of material fact as to whether Hurley was aware at the time Horton purchased the car that the check engine light would become an intractable repair problem.

The evidence established that Hurley took the vehicle to be repaired prior Horton's purchase.  In addition, he paid for numerous repairs to the Trailblazer.  Most importantly, although he indicated to Horton, in response to her September 18, 2012 letter, that he did not believe that the Trailblazer was under Warranty and that there were multiple, separate reasons why the check engine light kept coming on, he stated that "if you still have a pre-existing problem even though you are out of warranty i [sic] would be more than happy to take care of it for you for no charge."  This simply is not the statement of a debtor who intends to injure a plaintiff.  In other words, Hurley's conduct does not trigger in this Court's mind the category of an "intentional tort."  Geiger, 523 U.S. at  61-62.   Although Hurley erred in concluding the Warranty period had expired, his offer to take care of pre-existing problems at no charge, in effect agreeing to be bound by the repair aspect of the Warranty, undermines any claim for a willful and malicious injury.  In short, the Plaintiff failed to establish the existence of a genuine issue of material fact as to a willful and

_____

In re Coley, 433 B.R. at 499 (footnote omitted).

Lauzon, 2012 WL 1192800 at *10.

malicious injury that would warrant denial of summary judgment on Count I.


B. Counts II and VI

In McCrory v. Spigel (In re Spigel), 260 F.3d 27 (1st Cir. 2001), the United States

Court of Appeals for the First Circuit stated the following:

> The statutory language [of § 523(a)(2)(A)] does not remotely suggest that
> nondischargeability attaches to a claim other than one which arises as a direct
> result of the debtor's misrepresentations or malice. Thus, in order to establish
> that a debt is nondischargeable because obtained by "false pretenses, a false
> representation, or actual fraud," we have held that a creditor must show that
> 1) the debtor made a knowingly false representation or one made in reckless
> disregard of the truth, 2) the debtor intended to deceive, 3) the debtor
> intended to induce the creditor to rely upon the false statement, 4) the
> creditor actually relied upon the misrepresentation, 5) the creditor's reliance
> was justifiable, and 6) the reliance upon the false statement caused damage.
> Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir.1997). Though the first two
> elements of the Palmacci test describe the conduct and scienter required to
> show fraudulent conduct generally, the last four embody the requirement
> that the claim of the creditor arguing nondischargeability in an adversary
> proceeding must arise as a direct result of the debtor's fraud.

McCrory v. Spigel (In re Spigel), 260 F.3d at 32 (1st Cir. 2001) (footnote omitted).

In Palmacci, the First Circuit elaborated on the first element of misrepresentation as

follows:

> Regarding the first element, the concept of misrepresentation includes a false
> representation as to one's intention, such as a promise to act. "A
> representation of the maker's own intention to do . . . a particular thing is
> fraudulent if he does not have that intention" at the time he makes the
> representation. Restatement (Second) of Torts § 530(1); see Anastas v.
> American Sav. Bank (In re Anastas), 94 F.3d 1280, 1285 (9th Cir.1996). "The
> state of a man's mind is as much a fact as the state of his digestion."
> Restatement (Second) of Torts § 530 cmt. a. Likewise, "a promise made
> without the intent to perform it is held to be a sufficient basis for an action

of deceit." W. Page Keeton, et al., Prosser and Keeton on the Law of Torts §
109, at 763 (5th ed. 1984) (footnotes omitted); *see* Restatement (Second) of
Torts § 530(1) cmt. c. On the other hand, *if, at the time he makes a promise, the*
*maker honestly intends to keep it but later changes his mind or fails or refuses to*
*carry his expressed intention into effect, there has been no misrepresentation.*
Restatement (Second) of Torts at § 530 cmts. b, d. This is true "even if there
is no excuse for the subsequent breach. A debtor's statement of future
intention is not necessarily a misrepresentation if intervening events cause
the debtor's future actions to deviate from previously expressed intentions."
4 Collier on Bankruptcy ¶ 523.08[1][d], at 523–43.

The test may be stated as follows. If, at the time he made his promise, the
debtor did not intend to perform, then he has made a false representation
(false as to his intent) and the debt that arose as a result thereof is not
dischargeable (if the other elements of § 523(a)(2)(A) are met). *If he did so*
*intend at the time he made his promise, but subsequently decided that he could not*
*or would not so perform, then his initial representation was not false when made.*
*See, e.g.*, In re Anastas, 94 F.3d at 1285; Milwaukee Auction Galleries Ltd. v.
Chalk, 13 F.3d 1107, 1109 (7th Cir.1994) (more than mere nonperformance of
a contract was necessary to establish misrepresentation); Mellon Bank Corp.
v. First Union Real Estate, 951 F.2d 1399, 1410–11 (3d Cir.1991) (same); Craft
v. Metromedia, 766 F.2d 1205, 1219, 1221 (8th Cir.1985).

Palmacci, 121 F.3d at 786-87 (emphasis supplied).  The First Circuit added that fraudulent

intent or scienter "refers to a different type of intent, namely, intent to deceive, manipulate,

or defraud."  Id at 787.  The court noted that the scienter element can be satisfied in one of

several ways, including: " if the maker of the misrepresentation "(a) knows or believes that

the matter is not as he represents it to be; (b) does not have the confidence in the accuracy

of his representation that he states or implies; or (c) knows that he does not have the basis

for his representation that he states or implies." Id. (citations omitted).

Horton asserts that Hurley made a series of misrepresentations.  In this regard, the

only evidence submitted by the Plaintiff is that Hurley assured her that the six-year old

19

Trailblazer with approximately 39,000 miles would satisfy her driving needs.  The Plaintiff submitted no evidence that Hurley misrepresented the mechanical condition of the car.  *See* Whited v. Galindo (In re Galindo), 467 B.R. 201, 208 (Bankr. S.D. Cal. 2012), *aff'd,* 2013 WL 3389556 (B.A.P. 9th Cir. July 8, 2013).  Indeed, Hurley, prior to selling the Trailblazer to Horton, brought the vehicle to Topham Automotive and expended $486.01 to have the cause of the check engine light being on investigated and repaired, as well as other repairs performed.  The Plaintiff also submitted no evidence that Hurley misrepresented the odometer reading or prior ownership of the vehicle.  Accordingly, the Court finds that there is no genuine issue of material fact as to the scope of Hurley's representations about the condition of the Trailblazer or its suitability for Horton's needs to establish a claim under § 523(a)(2)(A).

Similarly, there was no evidence submitted by the Plaintiff that would create a genuine issue of material fact that Hurley had the intention of dishonoring the Warranty at the time it was executed.  Hurley expended significant sums on repairs to the Trailblazer after Horton purchased it.  That conduct belies any issues of material fact as to Hurley's intentions with respect to the Warranty at the time it was executed.      The Court concludes that the Plaintiff did not establish the existence of a genuine issue of material fact as to whether the Debtor knowingly, and with fraudulent intent, misrepresented the Trailblazer's condition or his intention to honor the Warranty to Horton at the time the purchase agreement was executed.

The Plaintiff, however, also maintains that Hurley's representation that the

20

Warranty had expired in his letter in response to her refund request was fraudulent.  The

Court rejects that contention because at that juncture the Plaintiff could not have relied

upon any representation by Hurley.  The Warranty was either applicable or not.  The

Plaintiff maintained that it was; Hurley maintained that it was not.  The Plaintiff could

have requested an arbitration proceeding or commenced an action against Hurley, but she

did not rely upon his representation to refrain from such a course of conduct.  Hurley

rejected Horton's demand for a refund, because he did not perceive the problem as an

insurmountable one, and he simultaneously offered to repair the Trailblazer at no charge

to Horton.  Under those circumstances, the Court concludes that, at most, the Plaintiff

submitted evidence that Hurley breached the parties' agreement by failing to honor the

refund aspect of the Warranty as required by Mass. Gen. Laws ch. 90, § 7N1/4.  The

Plaintiff was not harmed by Hurley's representation because she did not change her

conduct in reliance upon it as is evidenced by the claims made in this proceeding.

Because the Court concludes that the Plaintiff failed to establish a genuine issue of

material fact as to her claims under § 523(a)(4), and (6), the Court need not consider the

Plaintiff's claims that she has been damaged because of Hurley's refusal to refund the

repurchase price.

C. <u>Remaining Claims</u>

The Plaintiff also asserted claims under 15 U.S.C. 2301(f), the UCC and Ch. 93A.

Because the none of those claims would give rise to a nondischargeable debt and because

the Chapter 7 Trustee has filed a Report of No Distribution, the Court need not address

those claims as they would more properly be the subject of a proof of claim.

## VII.  CONCLUSION

For the reasons set forth above, the Court shall enter an order granting Hurley's Motion for Summary Judgment on Counts I and II.  Because the claims set forth in Count VI of Horton's Complaint are identical to those set forth in Count II, the Court shall enter summary judgment in favor of Hurley on Count VI.  The Court shall enter an order dismissing the remaining counts.

By the Court,


Joan N. Feeney
United States Bankruptcy Judge

Dated:  May 9, 2014